**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

**Case No.:  4:08-cv-00469 MHS-DDB**

WORLDPAK INTERNATIONAL, LLC,
A Delaware limited liability company,

      *Plaintiff/Counter-Defendant,*

vs.

DIABLO VALLEY PACKAGING, INC.,
a California corporation,

      *Defendant/Counter-Plaintiff.*
_____/

**MOTION FOR SPOLIATION**

    Plaintiff Worldpak International, LLC ("Worldpak"), hereby files its Motion for

Spoliation (the "Motion") and in support states as follows:

**INTRODUCTION**

    The evidence in this case convincingly shows that Diablo intentionally set out to

delete, destroy and conceal relevant evidence.[1]  For more than one year, Diablo

---

[1] In *Stanley v. Creative Pipe, Inc.,* Magistrate Judge Paul W. Grimm, imposed contempt sanctions on the defendant, including a two year sentence of imprisonment, as a result of the defendant's spoliation of evidence and other pervasive discovery violations.  The contempt sanctions were in addition to an award of default judgment as to the plaintiff's Count I and associated attorneys' fees and costs.  In a well-reasoned opinion, Judge Grimm held that the defendant would be imprisoned for up to two years until it paid the plaintiff's attorneys' fees and costs.  *See Stanley v. Creative Pipe, Inc.,* 2010 U.S. Dist. LEXIS 93644 (D. Md. Sept. 9, 2010).

The facts in *Stanley* are eerily similar to the facts in the instant case.  There, the defendant was culpable of eight discrete discovery failures: (1) failure to implement a litigation hold; (2) deletion of electronically stored information ("ESI") soon after the commencement of litigation; (3) failure to preserve an external hard drive after the plaintiff demanded preservation; (4) failure to preserve emails and files after plaintiff demanded their preservation; (5) deletion of ESI after the Court issued its first preservation order; (6) continued deletion of ESI and use of programs to permanently remove files; (7) failure to preserve ESI when defendant replaced server; and (8) further use of programs to permanently delete ESI after the Court issued numerous preservation orders.  *Id.*  The Opinion is also instructive in that it cogently addresses the lack of uniform national standards governing when the duty to preserve potentially relevant

refused to produce responsive documents.  This failure was not due to mere inadvertence or even to routine delays.  Diablo intentionally tampered with its computers, concealed the existence of a laptop, repeatedly misrepresented the completeness of its production to Worldpak and this Court and knowingly deleted responsive documents, including approximately 240,000 pages (four gigabytes) of emails.  It compounded these abuses by engaging in a premeditated fraud to conceal its actions, including the alleged mysterious "melting" of its chief executive officer's computer and the related destruction of the computer's hard drive.  Diablo did all of this with actual knowledge of a duty to preserve evidence.  When Diablo could no longer hide the intentional destruction of the hard drive, it attempted to pass off a completely different hard drive as the original in order to conceal its spoliation.  It then willfully and intentionally violated the Court's Order requiring Diablo to produce the original hard drive and to show evidence of a litigation hold.

The volume and timing of Diablo's actions are revealing.  Diablo deleted and destroyed this evidence long after litigation commenced.  It then took repeated, deliberate measures to conceal its actions, nonchalantly lying in affidavits, depositions, motions and in open court about what it had done.  With regards to the "melted" computer and destroyed hard drive, the destruction occurred while the parties were in the midst of a contentious discovery dispute, two weeks after Worldpak sent Diablo a preservation letter.  Remarkably, the record is devoid of any evidence that Diablo considered, let alone implemented a litigation hold once Worldpak filed its complaint.

---

evidence commences, the level of culpability required to justify sanctions, the nature and severity of appropriate sanctions and the scope of duty to preserve evidence.  *Id.*

Diablo's dogged efforts to prevent the discovery of its tortious actions are illuminating as to its state of mind.  Undeniably, Diablo was acting in bad faith.

Fortunately, its efforts have proven clumsy and ineffectual.  Although Diablo has been clearly successful in destroying considerable amounts of evidence, Worldpak's forensic experts have established that destruction and have been able to demonstrate the relevance of many deleted files and destroyed evidence.  There is no doubt that the unrecoverable, deleted and destroyed evidence would have supported Worldpak's claims for liability and damages.  The fact that Diablo undertook such repeated and calculated steps to delete and destroy evidence requires the conclusion that the unrecovered evidence is fatal to its case and beneficial to Worldpak.  To be clear, this evidence cannot be obtained through other sources.

The prejudice to Worldpak is apparent.  Diablo's bad faith destruction and deletion of evidence has hampered Worldpak's ability to prove its claims, both as to liability and the extent of damages.  This litigation has been unnecessarily and unreasonably prolonged.  Worldpak has been forced to spend staggering amounts of time and money negotiating e-discovery agreements, retaining forensic experts, deposing Diablo's consultants, filing motions, sifting through mountains of e-discovery in order to chase down relevant evidence in support of its claims.  Evidence that Diablo was legally required -- but intentionally refused -- to produce.  Regrettably, Diablo's delays have also impacted Worldpak's efforts to rehabilitate its reputation in the marketplace, following Diablo's defamatory statements to Worldpak's customers. Diablo's actions have not only burdened Worldpak, but also this Court, through the unnecessary misallocation of judicial resources.

Consequently, sanctions in this case are manifestly required and undeniably appropriate.  They are all that is available to punish such egregious conduct, to deter Diablo and future litigants from engaging in similar conduct and to fully mitigate the prejudice caused to Worldpak and the judicial process.

Accordingly, pursuant to Federal Rule 37 and this Court's inherent authority, Worldpak respectfully requests that this Court order an adverse inference instruction as to Worldpak's defamation, tortious interference and breach of contract claims. Additionally, Worldpak respectfully requests that this Court order Diablo to pay all costs associated with the discovery in this case, including the forensic retrieval of Diablo's intentionally withheld documents, as well as the attorneys' fees and costs associated with Worldpak's discovery efforts.

## <u>MEMORANDUM OF LAW</u>

### A.    Spoliation

Spoliation is the destruction or the significant and meaningful alteration of evidence.[2]  Electronically stored information is routinely deleted or altered.  Affirmative steps are customarily required to preserve it.  Deletions, alterations or losses constitute spoliation if there is a duty to preserve the information, a culpable breach of that duty, and resulting prejudice.

The duty to preserve arises when a party "has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation."  Generally, the duty to preserve extends to documents or tangible

---

[2] *See generally* The Sedona Conference, The Sedona Conference Glossary: E-DISCOVERY & DIGITAL INFORMATION MANAGEMENT (SECOND EDITION) 48 (2007) ("Spoliation is the destruction of records or properties, such as metadata, that may be relevant to ongoing or anticipated litigation, government investigation or audit.").

things by or to individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses."[3]

Once a duty to preserve is established, an adverse inference instruction based on spoliation is required when: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.[4]

Courts recognize that "[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction."[5]

## A.    Duty to Preserve

Here, Diablo had an absolute obligation to preserve the evidence in question at the time it was destroyed.[6]  Worldpak filed its Complaint in November 2008.  Jones' computer purportedly "melted" on March 1, 2010.  Similarly, forensic analysis of Diablo's replacement drive shows that Jones' deleted email existed on July 6, 2009.[7]  The duty to preserve this evidence was self-evident.  Nevertheless, Diablo took no steps to preserve evidence in this case.  Rather, it took positive action to destroy it.[8]

---

[3] *See, e.g., Zubulake IV,* 220 F.R.D. at 217-18 (footnotes omitted).
[4] *Id.,* at 212, 220 (S.D.N.Y. 2003).
[5] *Chan v. Triple 8 Palace, Inc.,* No. 03CIV6048(GEL)(JCF), 2005 U.S. Dist. LEXIS 16520, at *7 (S.D.N.Y. Aug. 11, 2005).
[6] Diablo nevertheless failed to put in place a litigation hold.  *See* infra Section B. 10.
[7] Moreover, Diablo accessed several other now deleted relevant files after Worldpak filed its Complaint. *See* infra Section B. 6.
[8] Proportionality and reasonableness are not at issue here, as Diablo has never alleged that it would have been an undue burden for it to preserve the evidence it destroyed.

### B.      Diablo Has Acted in Bad Faith

"Courts differ in their interpretation of the level of intent required before sanctions may be warranted."[9]  While some courts require mere negligence, the Fifth Circuit is part of a "distinct minority" of courts requiring a showing of bad faith.[10]  Diablo's pervasive history of discovery abuses easily meets -- and exceeds -- that standard.

Diablo's intentional discovery abuses can be organized into eleven discrete categories:  (1) the deliberate "melting" of its chief executive officer's computer; (2) its failure to preserve that computer's original hard drive; (3) its misrepresentation to Worldpak and this Court regarding what happened to the original drive; (4) the cover-up of its spoliation; (5) its flagrant disregard of this Court's Order requiring production of the original drive and evidence of a litigation hold; (6) its deletion of responsive documents; (7) its withholding of responsive documents; (8) its last-minute unilateral modification of the parties' e-discovery agreements; (9) its concealment of a laptop; (10) its failure to initiate a litigation hold; and (11) its failure to produce computer inventories and other related documents.  Taken individually, each act demonstrates intentional misconduct effected solely for the purpose of concealing damaging evidence.

### 1.  The Melted Computer

Diablo maintains that on March 1, 2010, while the parties were in the midst of a discovery dispute and negotiating the terms of the forensic examination of Diablo's computers and servers, Jones' computer inexplicably "melted," requiring full replacement.[11]  Although initially attributed to its close proximity to a space heater, the

---

[9] *Stanley,* 2010 U.S. Dist. LEXIS 93644, *68 (internal citations omitted).
[10] *Id.*
[11] *See* Exhibit A, Pg. 2, ¶4; *see also,* Exhibit B, Pg. 18, Lines 19-21.

facts now show that the computer was damaged intentionally in order to conceal relevant evidence.

Diablo allegedly contacted its information technology consultant, Techpro, immediately regarding a replacement for the computer.[12]  Techpro's chief operating officer, Christopher Cannon ("Cannon"), examined the computer that same day.  He found the computer flush against the inside right wall of the desk.[13]  The plastic casing was slightly warped.  Notably, there was no smoke in the room and the plastic was cool.[14]

Cannon initially determined that the computer had overheated and would not turn on.[15]  He found no internal damage.[16]  He speculated that the machine had been damaged due to its close proximity to Jones' space heater.[17]  Notably, in sixteen years of experience, Cannon had never heard of the external plastic casing of a computer melting.[18]  Significant heat would have been required.

Contradicting his "expert," Jones testified that his computer melted due to a reaction with his wireless mouse receiver (the "Receiver").[19]  Jones claimed that the machine began having a strange reaction.  He looked down and claims the computer

---

[12] Exhibit C, Pg. 146, Lines 13-16.
[13] Exhibit B, Pg. 26, Lines 2-5.
[14] *Id.,* Pg. 25, Lines 8-24.
[15] *Id.,* Pg. 28, Lines 1-11.
[16] *Id.,* Pg. 29-31.
[17] *Id.,* Pg. 28, 1-15.
[18] *Id.,* Pg. 21, Lines 20-25.
[19] Exhibit C, Pg. 144, Lines 18-25; Pg. 145, Lines 1-3.  A wireless mouse receiver connects to the USB port in a computer and works via radio frequency, eliminating the need for wires connecting the mouse to the computer.

was melting.[20]  The Receiver allegedly melted as well, which, in Jones' view, also caused the computer to melt.[21]

Diablo's story is simply not credible.  The outside casing of a computer is made of Polystyrene 495F plastic.[22]  Polystyrene 495F melts at 464 degrees Fahrenheit (240 degrees Celsius), consistently generated over a prolonged time period.[23]  This means that in order for the space heater to have melted Jones' computer, it would have needed to be at extremely close proximity to the machine, producing at least 464 degrees Fahrenheit of continual heat for a significant period.

Progressing to the absurd, Jones testified that the heater was located on the left-hand side of his desk and that he was sitting between the heater and the computer.[24]  Based on the amount of heat and time required to melt the outside plastic casing of the machine, Jones' legs would have been severely burned before the computer was ever impacted.  Indeed, Jones testified that because his legs often get hot when the heater is on, he is required to turn the heater off, and never leaves the heater on for continuous periods of time.[25]  There were no reported burn injuries.

Finally, there is a clear inconsistency between Jones' and Cannon's testimony.  Jones maintained that the melting of the Receiver caused his computer to melt.  Notably, Jones never bothered to remove the Receiver from the USB port.[26]

---

[20] *Id.,* Pg. 146, Lines 6-24.
[21] *Id.,* Pg. 145, Lines 1-3.  Jones later testified that, based on Techpro's observation, the computer had a reaction with the space heater, which caused the melting.
[22] Exhibit D.
[23] *Id.*
[24] *Id.,* Pg. 148, Lines 2-22.
[25] *Id.*
[26] *Id.,* Pg. 146, Lines 17-19.

Cannon, to be sure, made no mention of this Receiver.  Although Worldpak has requested evidence of the melted Receiver, it still has not been produced.[27]  There is similarly no evidence near the USB port that anything melted in or around it.[28]

The circumstances and timing of this entire incident – while the parties were in the midst of a contentious discovery dispute related to intentionally withheld documents – is entirely and necessarily incredible.  The plastic casing could only have melted if someone was applying continual high direct heat to the machine in an intentional effort to damage it.

### 2.  Failure to Preserve the Original Drive

Compounding the issue, after the "meltdown," Diablo directed Cannon to take the computer to Techpro to cannibalize the parts, to scavenge them for use in other machines.[29]  Diablo never advised Cannon of the duty to preserve Jones' computer and, more significantly, the computer's original drive ("Original Drive").[30]  This omission is particularly revealing since the parties were actively addressing the forensic examination of Jones' drive.

On March 4, 2010, Cannon returned with both a replacement computer and the Original Drive.  He claims to have transferred Jones' data from the Original Drive to the replacement computer.[31]

However, the transferred image (copy)[32] did not include any of Jones' deleted files contained on the Original Drive.  Although Cannon initially maintained that the

---

[27] Worldpak requested evidence of this Receiver during a break in Reno's deposition.  Moreover, Worldpak requested it in Worldpak's subpoena duces tecum served on Cannon.
[28] *See* Exhibit E.
[29] Exhibit A, Pg. 2, ¶ 6.
[30] Exhibit B, Pg. 37, Lines 1-25.
[31] Exhibit A, Pg. 2, ¶ 5; Exhibit B, Pg. 32-34.
[32] "Image" is a technical term of art that means copy.

9

program utilized captured *all* of Jones' files, including the deleted files, Cannon had failed to select the option necessary to do so.  He was unaware that such an option existed.[33]

Confirming that significant amounts of data were irretrievably lost, Cannon testified that if Jones had deleted any files from his computer prior to it melting, the program may not have transferred the deleted files to the replacement computer.[34] Under these circumstances, Jones' deleted files would be lost forever.

Cannon then removed Jones' Original Drive for later use in another machine. Once again, at no point did Diablo advise Cannon, whether orally or in writing, to preserve the Original Drive.[35]

### 3.   Misrepresenting What Happened to the Original Drive

On April 16, 2010, Cannon took Jones' Original Drive to his home for his own use. He claims that at this time he made a duplicate image of the files stored on Jones' Original Drive.[36]  However, Cannon again did not select the option necessary to preserve the deleted files.[37]  He was unaware that such an option existed.[38]  Cannon then loaded his mother-in-law's files onto the Original Drive.

---

[33] Exhibit B, Pg. 33, Lines 12-25; Pg. 34, Lines 1-3.

[34] Exhibit B, Pg. 69, Lines 11-17; Pg. 65, Lines 13-25; Pg. 66, Line 1.

[35] Exhibit A, Pg. 2, ¶ 5; Exhibit B, Pg. 36, Lines 18-25.

[36] Exhibit A, Pg. 2, ¶ 7; Exhibit B, Pg. 38-41.  Cannon claims he loaded this duplicate image onto an external hard drive.

[37] The mere fact that an individual deletes data from his hard drive does not mean that the data is irretrievable.  Forensic analysts have the ability to retrieve the deleted data from a hard drive using special software programs and techniques. Moreover, if a duplicate image (copy) of the files stored on the drive is made, the image must be a forensic one in order to preserve the deleted files and remnant data contained on the original drive.

A forensic image is a *complete* image of all of the files stored on a hard drive, including deleted files and remnant data.  The forensic image preserves every sector of areas of the disk, including those areas not currently in use, where deleted files and remnant data is found.  However, a non-forensic image excludes contents of deleted files and areas of the disk not currently in use, including deleted and remnant data.

Cannon ultimately decided not to utilize the Original Drive.  He asserts that he left it in his "garage rafters," where he contends it remained until Worldpak requested it.[39]

On June 16, 2010, consistent with the parties' e-discovery agreements, Worldpak's e-discovery consultant (the "Consultant") arrived at Diablo's facilities to image files stored on specific hard drives and servers.  At that time, Diablo advised Worldpak *for the first time* that Jones' computer had previously melted.  Although the parties had been actively negotiating the terms of the forensic exam for nearly four months, the alleged "melting" was never mentioned.  Diablo then advised the Consultant that it had loaded all of Jones' original files onto a replacement computer, which it made available for imaging.  The Consultant appropriately requested the Original Drive for analysis.[40]

On June 25, 2010, the mystery – more correctly the deception – deepened.  Diablo advised the Consultant that the Original Drive had been somehow inexplicably over-written with an image from another computer.[41]  The Consultant persisted in his request for the Original Drive together with the replacement image for analysis.[42]

On June 28, 2010, Worldpak filed its response to Diablo's motion to vacate.  Based on what had been discovered regarding the Original Drive, Worldpak noted that spoliation had occurred.  [D.E. 77, at 5].  Diablo scrambled to assure the Consultant that

---

In this regard, the two images Techpro made of Jones' Original Drive were non-forensic.  Although approximately 105 references to deleted files were found during the imaging process of Jones' drive, the contents of the majority of these files are no longer retrievable.  Accordingly, none of the deleted files or remnant data was captured in the imaging process.  Additionally, upon Worldpak's request for the Original Drive, Diablo produced another drive it falsely claimed was the Original.  Without the Original Drive, Worldpak cannot retrieve Jones' deleted files.

[38] Exhibit B, Pg. 41, Lines 18-25; Pg. 42, Lines 1-9.

[39] *Id.,* Pg. 46-47.

[40] Composite Exhibit F.

[41] To over-write means to copy new files onto a drive containing existing files.  In this process, the existing files are deleted and replaced by the new files.

[42] Exhibit G.

Diablo had been mistaken.  Diablo now claimed, in an epiphany, that the Original Drive

had in fact never been over-written and was still in its original state.[43]

Although Diablo assured the Consultant that the drive was in its original state,

this statement was clearly false.  Cannon later testified that on June 28, 2010, he

completely deleted all of the files contained on Jones' Original Drive.[44]  He did so even

though the Consultant had been insisting for over two weeks that it needed the Original

Drive to conduct its spoliation analysis.  Cannon then claims to have loaded the

replacement image of Jones' files onto to the purported Original Drive.[45]  However, the

replacement image did not contain any of Jones' deleted files.[46]

### 4.  The Cover-Up

Faced with the obvious spoliation of the Original Drive, Diablo presented

another drive that it falsely claimed was the Original Drive.  Two weeks after Worldpak's

initial request, Diablo produced the sham hard drive.  Analysis of this drive has

demonstrated that it is not Jones' Original Drive.

First, Diablo claims that the Original Drive was manufactured in 2003 and was

approximately seven years old.  The date code on the drive Diablo hoped to pawn off as

the Original Drive establishes that this fake Original was manufactured in 2007 and is

only three years old.[47]

Second, the Windows operating system file log also shows that it is not the

Original Drive.  Windows detects when it is first installed onto a new drive.  It maintains

---

[43] Composite Exhibit F.
[44] Cannon maintains that he loaded his mother-in-law's files onto Jones' Original Drive.  When Worldpak requested the Original Drive, rather than producing it with all of the files, Cannon inexplicably ran a program to delete every single file contained on the drive.  He then loaded a non-forensic image of Jones' files that he had previously made onto the purported Original Drive.
[45] Exhibit A, Pg. 3, ¶ 8.
[46] The replacement image was a non-forensic image.  See *supra* note 35.
[47] Exhibit H, ¶ 6.

this information.  The drive Diablo produced to Worldpak was first recognized by the
Windows operating system on June 28, 2010.  This absolutely precludes it from being
the Original Drive.[48]

The Windows log for the Original Drive would have had to reflect recognition
significantly prior to March 1, 2010, the date Jones' computer purportedly "melted."  The
Windows set up log file first recognized this fake Original Drive on June, 28, 2010.  Not
coincidentally, this is the exact same date that Worldpak raised the spoliation issue.[49]

Finally, and perhaps most dispositively, the computer log shows that the sham
drive has a different model number than the Original Drive.  Namely, the drive Diablo
produced has a model number of ST3160815A.  The model number of the real Original
Drive is ST3160022A.[50]

Diablo never produced Jones' Original Drive.  Rather, the data on the produced
drive shows that on June 28, 2010 -- the same day that Worldpak raised the spoliation
issue -- Diablo loaded the *remaining* data from Jones' Original Drive onto a newer drive
with a different model number than Jones' original.  This was a clear, if clumsy and
unsuccessful, effort to pass this other drive off as Jones' Original Drive in order to
conceal its efforts at spoliation.

### 5.  Failure to Comply with this Court's Order

At a July 13, 2010 hearing, Worldpak advised the Court that the drive Diablo
produced was not the original and that countless documents had been intentionally
deleted and were no longer recoverable.  Worldpak also confirmed to the Court that
Diablo had failed to put in place a litigation hold.

---

[48] *Id.*
[49] *Id.*
[50] *Id.*

Recognizing that the Original Drive could reveal additional data, the Court noted that Worldpak was entitled to the Original Drive.  Although Diablo implausibly maintained that it had already produced the Original Drive, the Court stressed that "if there's evidence that [the produced drive] was not the original hard drive then there's going to be some problems here."[51]

The Court understandably voiced serious concern that Diablo would allow a key employee's hard drive to leave its facitilies, indicating that "it shocks the conscience that would even happen, that [the Original Drive] wouldn't be kept there, no matter who backs it up or whatever."[52]

Accordingly, the Court ordered production of the Original Drive.  The Court also ordered that Diablo produce evidence that it put a litigation hold in place.[53]  Diablo explicitly disobeyed this Court's orders.  To date, Diablo has failed to produce the Original Drive or to show *any* evidence of a litigation hold.

### 6.  Deletion of Documents

Separately it has been established that prior to the "melting," and after litigation commenced, numerous documents, including over 240,000 pages of email, were intentionally deleted.[54]  Jones' "replacement drive" contains references to at least 105 deleted files.[55]  The names of these files show that many were relevant.[56]  The absence of such a large quantity of files confirms that they were clearly prejudicial.[57]

---

[51] Exhibit I, Pg. 46, Lines 16-18.
[52] *Id.,* Pg. 56, Lines 13-18.
[53] *Id.*, at Pg. 45, Lines 4-25; Pg. 46, Lines 1-18; Pg. 49, Lines 1-6; Pg. 66, Lines 22-25; Pg. 67, Line 1; Pg. 57, Lines 5-9.
[54] Composite Exhibit F; Exhibit I; Exhibit H, ¶ 11.
[55] Exhibit J.
[56] *See Stanley,* 2010 U.S. Dist. LEXIS 93644.
[57] *Id.*

There may be countless other files that were not captured during the copying of Jones' replacement computer.

With regards to the missing mountains of emails, they were available to Jones, and accordingly should have been available to Worldpak, eight months after Worldpak filed its Complaint.[58]  To be clear, these emails are no longer recoverable.

While Cannon initially asserted that Jones' deleted files were recovered, he subsequently recanted.  Cannon ultimately testified that if Jones had deleted files prior to the "melting," the deleted files may not have salvaged.[59]

Similarly, the second program Cannon used when imaging Jones' files contained on the Original Drive, did not capture Jones' deleted files.  Cannon also failed to select the necessary option on that program to create a forensic image.[60]

Contrary to Cannon's assertions, the copying of Diablo's servers and back-up tapes did not capture the deleted files.[61]  Email is commonly deleted or relocated from an Exchange Server.[62]  Consequently, it is intentionally misleading to suggest that every email accessed on Diablo's internal network/email system would still be contained on the Exchange Server.[63]

More significantly, deleted emails would no longer be in the Exchange Server's "dumpster" file.  Cannon initially assumed that "there would be a dumpster file of [deleted emails] on the Exchange Server" -- a clearly uninformed assumption.[64]

---

[58] *Id.*  Analysis of the replacement image of Jones' Original Drive demonstrates that Jones last accessed this email file on July 6, 2009.  Similarly, the other deleted files were also accessed after the Complaint was filed.
[59] Exhibit B, Pg. 65, Lines 13-25; Pg. 66, Line 1; Pg. 69, Lines 11-17.
[60] *Id.,* Pg. 41, Lines 18-25; Pg. 42, Lines 1-9.
[61] Exhibit A, Pg. 3, ¶ 9.
[62] An Exchange Server is an Internet-compliant messaging system that runs under Windows and can exchange email clients such as Outlook, Apple Mail, entourage, etc.
[63] Exhibit H, ¶ 10.
[64] Exhibit B, Pg. 57, Lines 4-7.

Diablo's purge policy was previously put in place by someone other than Cannon.  He never attempted to determine Diablo's purge policy.[65]  Diablo's dumpster mail policy was set for 60 days.  After 60 days all deleted files were purged from the system.[66]

Thus, despite the significant time and money devoted by Worldpak in attempting to retrieve these files from Diablo, they are no longer retrievable.

### 7.  Withholding of Documents

Prior to the forensic examination, Diablo intentionally withheld numerous key documents from its production.  These included correspondence memorializing Diablo's tortious interference with Worldpak's agreement with San Miguel and other correspondence explicitly defaming Worldpak.  The forensic examination was necessitated when it became obvious that Diablo was concealing these documents.

Despite Diablo's meaningless assurances, the forensic examination revealed a multitude of damaging documents previously withheld.  Diablo's initial productions, superficially large, were infused with unresponsive documents and multiple copies of documents that Diablo believes helpful only to *its* case.

Although Diablo has insisted – under penalty of perjury – that it had no contacts with San Miguel regarding direct purchases prior to April 15, 2008, the forensic examination yielded examples of Diablo's surreptitious contacts with San Miguel as early as October 2006.[67]  They also demonstrate disparagement of Worldpak to its customer Del Monte, in an effort to take that business.  Additional documents, also previously withheld, indicate that by 2007, Diablo had retained Chinese brokers to aid it

---

[65] *Id.,* Pg. 56, Lines 8-25; Pg. 57, Lines 1-25; Pg. 58, Lines 1-2.
[66] Exhibit H, ¶ 9.
[67] *See* Composite Exhibit K.  To be clear, Worldpak's Agreement was in full force and effect on April 15, 2008, as it contained no expiration date and was not terminated by either party.

in purchasing directly from San Miguel in violation of Worldpak's agreement.[68]
Undoubtedly, this is part of a clear pattern of bad faith discovery abuses.

### 8.   Unilaterally Modifying E-Discovery Agreements

Recognizing what the forensic examination would reveal, Diablo purported to modify unilaterally the terms of the parties' e-discovery agreements.  Although contractually committed to provide access to its file server, without limitation, when the Consultant arrived at Diablo's facilities, he was advised *for the first time* upon his arrival that the files contained on that server were proprietary and off-limits.  Diablo coupled this obviously indefensible assertion with the announcement that the laptop computer of Diablo's global sourcing manager, Agatha Auduon ("Auduon"), was unavailable and that Jones' computer had "melted."[69]

On Worldpak's motion, this Court ordered Diablo to submit the file server to a forensic examination consistent with the parties' agreements.[70]  Because Diablo had reneged on its agreement, the Court ordered Diablo to pay fifty percent of all costs associated with that effort.[71]

### 9.   Concealing the Existence of a Laptop

Diablo had also agreed that Worldpak could copy the files stored on Jones' laptop.  However, following their now customary script, Diablo advised the Consultant that Jones did not own a laptop.[72]

This lie was short-lived when Cannon testified that Jones indeed owns a laptop, which he utilizes when traveling.[73]  Although consistent in its efforts to deceive

---

[68] *See* Composite Exhibit L.
[69] *See* Composite Exhibit F.
**[70]** Exhibit I, Pg. 58, Lines 1-25; Pg. 59, Lines 1-16.
[71] *Id.,* Pg. 61, Lines 1-5.
[72] *See* Composite Exhibit F.

and mislead, Diablo is hardly adroit in this regard.  It sheepishly produced the "non-existent" laptop.

### 10. Failure to Initiate a Litigation Hold

Diablo took no steps whatsoever to communicate the need for a litigation hold to its employees or consultants or to place a litigation hold in effect.

Although Diablo is, not surprisingly, involved in a similar lawsuit brought by another distributor for tortious interference and, not surprisingly, has been previously involved in other litigation, Jones initially testified that he was unaware of *any* duty to preserve relevant evidence in this case.[74]  Accordingly, he took no steps to preserve evidence, including his computer[75] and similarly failed to notify his employees and agents of their duty to do so. [76]  Jones' "ignorance" is neither credible nor unintentional. [77]

When that became clear, Jones attempted to change his testimony.  Following a break in his deposition, during which he met with counsel and Reno, Jones had an epiphany.  Reno, Jones suddenly "revealed," had advised him of the duty to preserve.[78] Jones could recall *none* of the details of this purported conversation.[79]  He continued to insist that there had been no written communications regarding the litigation hold, even though Diablo normally sends its employees emails communicating important company policy.[80]

---

[73] Exhibit B, Pg. 20, Lines 20-25; Pg. 21, Line 1.
[74] Exhibit C, Pg. 172, Lines 6-25; Pg. 173, Lines 1-25; Pg. 174, Lines 1-2.
[75] *Id.*
[76] *Id.*
[77] As the chief executive officer of a $70 million business, there is simply no credible reason why Jones would have been uninformed of Diablo's duty to preserve. *Id.*, Pg. 16, Line 25; Pg. 17, Line 1.
[78] *Id.,* Pg. 180, Lines 2-11.
[79] *Id.,* Pg. 181, Line 25; Pg. 182, Lines 1-19.
[80] *Id.,* Pg. 180, Lines 11-25; Pg. 181, Lines 1-24.

Reno's helpful "reminder" was similarly belied by the facts.  There was no litigation hold memorandum.  He claims that he advised Diablo managers verbally of the duty to preserve, for whatever negligible and legally inadequate benefit that could have provided.[81]  Indeed, Reno even claims to have communicated this duty to his brother-in-law and former Diablo vice-president, Yaklin, who still utilizes a company computer.[82]

Yaklin, of course, testified to no such thing.  Not only was he uninformed of any duty to preserve, he did not become aware of the underlying litigation until Worldpak served him with a subpoena on July 22, 2010.[83]  In customary fashion, Diablo never requested that he search his laptop for potentially relevant documents. This "oversight" no doubt was prompted by the fact that Yaklin surreptitiously met with San Miguel officials on behalf of Diablo in October 2006, so as to obtain direct pricing quotations.

Diablo's comprehensive failure to communicate a litigation hold was manifestly intentional.  Sensing that vast spoliation was occurring, on February 18, 2010, in the midst of a Diablo-instigated discovery dispute, Worldpak sent Diablo a letter reminding it that it was "obligated to ensure that" the documents Diablo had intentionally withheld from its production "were not deleted from the system."[84]  Diablo needed to take "affirmative steps to preserve both paper documents and electronically-stored information," lest it be met with a motion for spoliation.[85]  This occurred two weeks prior to the absurd "meltdown" of Jones' computer.  Astonishingly, unless intentionally, Diablo *still* failed to communicate the litigation hold to its consultant, Techpro, or ask that it

---

[81] Exhibit M, Pg. 223, Lines 5-25; Pg. 224, Lines 1-5.
[82] *Id.*
[83] Exhibit N, Pg. 128, Lines 17-25; Pg. 129, Lines 1-24; Pg. 31, Lines 2-4.
[84] Exhibit O.
[85] *Id.*

preserve the Original Drive contained in Jones' "melted" computer.  Diablo's efforts were aimed at destruction not preservation of evidence.[86]

### 11. Failing to Produce Diablo Computer Inventories and Other Related Documents

Diablo's consultant, Techpro, indicated that it would produce specific documents to Worldpak related to Diablo's computers and servers.  Additionally, after the foolishness surrounding Jones' laptop, Worldpak understandably requested that Techpro produce an inventory, listing all of the computers utilized by Diablo's employees.  Additional concealment was a legitimate concern.

Worldpak reminded Techpro of this obligation in writing.[87]  Diablo's counsel's promised that the documents were forthcoming.[88]  They have never been produced. Diablo is undoubtedly concealing additional evidence.

### C.  Relevance

In the context of spoliation, lost or destroyed evidence is "relevant" if "a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."[89]  Moreover, for the Court to issue sanctions, the absence of the evidence must be prejudicial to the party alleging spoliation of evidence.[90]

There can be no doubt that the evidence in question was relevant to Worldpak's claims and that Worldpak has been prejudiced by Diablo's bad faith deletion and destruction of this evidence.

---

[86] Diablo has yet to comply with this Court's Order to provide proof that a litigation hold was put in place.
[87] Exhibit P.
[88] Exhibit Q.
[89] *Stanley,* 2010 U.S. Dist LEXIS, *68.
[90] *Id.*

### 1.  The Destroyed Evidence Would Have Supported Worldpak's Claims

This sorry history would compel a reasonable fact finder to conclude that the missing evidence would have been instrumental in supporting Worldpak's tortious interference, defamation, breach of contract and damage claims.  For example, since Diablo's initial production in May 2009, Worldpak has discovered several responsive documents, previously withheld, that plainly refute Diablo's contention that it did not contact San Miguel to establish a direct purchasing relationship until April 15, 2008.[91]

Recently discovered Diablo documents show that in September 2006, Reno, engaged his brother-in-law, Yaklin, as an agent in order to establish a direct purchasing relationship with San Miguel.  Diablo promoted Yaklin to vice-president when he succeeded.[92]

The documents further show that Diablo knew in March 30, 2008, that Worldpak had an agreement with San Miguel.[93]  Diablo nevertheless ploughed ahead to urge San Miguel to use Diablo, rather than Worldpak, as its exclusive United States distributor.  Diablo even offered to *immediately* purchase all existing Diablo inventories from San Miguel in the event that Worldpak discovered Diablo's tortious actions and cut-off its supply.  Notably, Jones had previously deleted this clearly probative email from his computer.  It was retrieved through alternate sources.

---

[91] Worldpak's agreement was in full force and effect on April 15, 2008.

[92] Composite Exhibit K.

[93] Exhibit R.  This email is clearly probative of Diablo's tortious interference.  Significantly, Jones deleted this email from his computer, demonstrating that numerous other emails Jones deleted were relevant to Worldpak's claims.  Fortunately, Worldpak was able to recover this email from the forensic analysis of Reno's hard drive.  *See Rimkus,* 688 F. Supp. at 617-618 (finding that there is no need to rely on a "presumption of relevance or prejudice" when "the party seeking sanctions for deleting emails after a duty to preserve had arisen presented evidence of their contents" including "some recovered deleted emails and circumstantial evidence and deposition testimony relating to the unrecovered records…"); *see also, GE Harris Ry. Elecs., L.L.C. v. Westinghouse Air Brkae Co.,* 2004 WL 5702740, at *4-5 (D. Del. Mar. 29, 2004) (holding an adverse inference instruction was warranted when the defendant deleted relevant emails and electronic files and the emails the plaintiff was able to recover from other sources were probative of the defendant's liability).

The forensically retrieved documents also show that *after* Diablo convinced San Miguel to breach its supply agreement with Worldpak, Diablo immediately targeted Worldpak's customer, Del Monte.   Diablo recounted Worldpak's financial and supply issues -- which were exclusively of Diablo's making -- and urged Del Monte to use Diablo, rather than Worldpak, as Del Monte's supplier.[94]

Additionally, following their secret visit to San Miguel's Chinese manufacturing plant in April 2007, Reno and Diablo Global Sourcing Manager, Auduon, remained in direct contact[95] with San Miguel sales representative, Monica Wang ("Wang").[96]   Diablo did so, even though Reno conceded that it was improper protocol for a distribution customer to circumvent its broker and contact the manufacturer directly.[97]   Diablo then retained Chinese brokers to facilitate in its clandestine purchasing of San Miguel glass.[98]   Purchasing glass through these brokers would prevent Worldpak from discovering Diablo's tortious conduct, as Diablo's name would not appear on any documents, including bills of lading and shipping manifests.[99]   Accordingly, Diablo began obtaining direct quotes from Wang by May 2007, at the latest.

---

[94] Exhibit S.

[95] Reno obtained Wang's direct contact information, including her mobile number, during that visit. Composite Exhibit L, #1.

[96] *See generally,* Composite Exhibit L.

[97] Exhibit M, Pg. 130, Lines 7-16; Pg. 131, Lines 7-25; Pg. 132, Lines 1-3.

[98] The names of the two Chinese brokers are Jingsheng and Mr. Luo.  *See* Composite Exhibit L, # 2, 3, 7, 8, 9, 11.

[99] *Id.*  The forensically retrieved documents further show that by May 2007, Diablo was already obtaining direct pricing quotations from San Miguel through its Chinese brokers.  In accordance with Auduon's instructions, Diablo's brokers would contact Wang, who would in turn provide the brokers pricing quotations for Diablo.  *Id.,* # 2, 3, 4, 7, 9, 11.

Moreover, upon solidifying its relationship with San Miguel, Diablo then contacted Worldpak customer, Imperial, offering to sell Imperial San Miguel glass.[99]  *Id.,* # 10.

Throughout 2007 Diablo remained in contact with San Miguel.  In August 2007, Diablo contacted its Chinese broker, so that it could obtain pricing quotations for 3 million bottles made from mold AKF39.  *Id.,* #9 , 11.  Again in October 2007, Diablo obtained several quotes from San Miguel, including for the 32 ounce barrel and 14 ounce apple ring jars. *Id.,* # 2, 3, 4.

A November 2007 email from Auduon to Jones and Reno demonstrates that Auduon communicated extensively with Wang throughout 2007, regarding selling directly to Diablo.  Auduon indicated that "[i]f Monica [Wang] from San Miguel comes along and promises to work with us, DVP will be in 'great shape' in the coming year."[100] Auduon also forwarded the Chinese broker contact information for Envases Globales, an off-shore Nevis company Diablo established in order to circumvent a competing distributor's agreement with another glass manufacturer.[101]  Clearly, Diablo intended to purchase the San Miguel glass through Envases Globales, so that Worldpak would not discover its deception.[102]  Diablo has insisted that this Nevis corporation was created solely to gain some undisclosed "tax advantages."  Were this assertion the whole truth, there would have been no logical reason for Auduon to provide the Chinese broker with the company's address.

It bears mentioning once again.  <u>None</u> of these documents was included in any of Diablo's productions.  They were retrieved at substantial cost to Worldpak.[103]  These communications directly refute assertions made by Reno, who has continually insisted -- under the penalty of perjury -- that "[a]t no time between 1997 and April 15, 2008, did DVP or its agents/employees meet with any member of [San Miguel's] staff to discuss the purchase of glass."[104]  More importantly, the documents show that Diablo was purchasing glass directly from San Miguel in 2007.[105]

---

[100] *Id.,*#5.

[101] The competing glass distributor is Silver Spur based out of California.  The manufacturer is Taiwan Glass.  *See* infra note 104.

[102] *Id.,* #8.

[103] There is additional, substantial Auduon correspondence between her and others, including the two brokers, in Chinese.  Worldpak has been unable to decipher to contents of these documents, due to the inordinate amount of time and money it would cost to translate them.

[104] Diablo further intentionally represented that "[a]lthough [Reno] and other DVP representatives did speak with representatives of [San Miguel] prior to April 2008, those discussions did not in any way concern the possibility of DVP purchasing product directly from [San Miguel].  Rather, those discussions

### 2.        Worldpak Has Suffered Severe Prejudice

The scale of the relevance of the Original Drive and the deleted files is vast and undeniable.  They are highly likely to have yielded additional evidence relevant to Worldpak's tortious interference, defamation, breach of contract and damage claims.[106] For example, these documents would have revealed, *inter alia,* evidence of actual direct purchases made from San Miguel through the Chinese brokers and/or other Diablo agents prior to April 2008.  The documents would have similarly revealed additional direct communications between Diablo and Worldpak customers such as Imperial, Del Monte and Mezzetta, defaming Worldpak in an effort to take its business.  Finally, these documents would have revealed additional direct purchases of glass subject to the parties' Mold Agreements and efforts by Diablo to block San Miguel sales to Worldpak of glass made from proprietary Worldpak molds.

Rebutting, as they do, numerous statements under oath by Diablo's witnesses, this missing evidence would clearly be instrumental in challenging the truth and veracity – and therefore the credibility – of Diablo's trial witnesses.

Diablo's intentional destruction of this evidence has hampered Worldpak's efforts to prove its defamation claim and to fully demonstrate the extent of Diablo's tortious interference, its breach of contract and Worldpak's damages.  Worldpak's discovery expenses have been unnecessarily bloated and its ability to present its case has been

---

were discussions regarding product delivery and problems DVP was experiencing with receiving [San Miguel's] products through [Worldpak]." Exhibit T, Pg. 5, ¶ 12.

[105] Similarly, the forensic documents also demonstrate that, despite Diablo's repeated insistence -- under oath -- to the contrary, Diablo was also tortiously interfering with competing distributor, Silver Spur's, exclusivity agreement with Taiwan Glass.  Composite Exhibit U.

[106] Indeed, forensic analysis of Diablo's drives and servers reveals that Jones previously deleted the March 30, 2008, email to him from Reno – a clearly relevant document establishing Diablo's tortious interference -- advising of the existence of an agreement between Worldpak and San Miguel.  *See supra,* note 92.

measurably impacted.   The resolution of this case has been unreasonably delayed. Finally, Worldpak has been unable to rehabilitate its reputation in the marketplace, following Diablo's defamatory statements to its customers.   Clearly, Worldpak has been severely prejudiced as a result of Diablo's continual bad faith actions.

### C.    Sanctions[107]

Willful or intentional destruction of evidence to prevent its use in litigation justifies and supports severe sanctions.   The severity of a sanction for failing to preserve when a duty to do so has arisen must be proportionate to the culpability involved and the prejudice that results.   Such a sanction should be sufficient to respond to the need to punish or deter and to address the impact on discovery.   A measure of the appropriateness of a sanction is whether it "restore[s] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."[108]   Accordingly, the sanction of an adverse inference instruction is

---

[107] Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed in federal courts through the inherent power to regulate the litigation process if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-46 (1991); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.,* 2 F.3d 1397, 1408 (5th Cir. 1993).   If an applicable statute or rule can adequately sanction the conduct, that statute or rule should ordinarily be applied, with its attendant limits, rather than a more flexible or expansive "inherent power." *Chambers, 501 U.S. at 50; see Klein v. Stahl GMBH & Co. Maschinefabrik,* 185 F.3d 98, 109 (3d Cir. 1999) ("[A] trial court should consider invoking its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance . . . ."); Natural Gas Pipeline Co. of Am., 2 F.3d at 1410 ("When parties or their attorneys engage in bad faith conduct, a court should ordinarily rely on the Federal Rules as the basis for sanctions.").

Additionally, Fed. R. Civ. P. 37(b)(2)(A)(vii) provides that the court may "treat[] as contempt of court the failure to obey a court order to provide or permit discovery of ESI evidence.   Similarly, pursuant to its inherent authority, the court may impose fines or prison sentences for contempt and enforce "the observance of order."  *Stanley,* 2010 U.S. Dist. LEXIS 93644, *80.

[108] *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999) (quotation omitted); s*ee also, Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001) ("[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." (quoting West, 167 F.3d at 779)).

appropriate when "the party is prejudiced, but not irreparably, from the loss of evidence

that was destroyed with a high degree of culpability…"[109]

It is difficult to believe that the systematic, multiple, calculated efforts to destroy,

conceal or impair evidence, accompanied by knowing false statements under oath do

not justify sanctions.  Diablo has made a mockery of discovery.  The Court is not

addressing a random incident.  What was done was comprehensive, knowing and with

a clear improper purpose.

Accordingly, pursuant to Federal Rule 37 and this Court's inherent powers,

Worldpak respectfully requests that this Court order an adverse inference instruction as

to Worldpak's defamation, tortious interference and breach of contract claims due to the

severe prejudice Worldpak has suffered as a direct result of Diablo's intentional

destruction of key evidence, including significantly impairing Worldpak's ability to prove

these claims and fully assess its damages.  Additionally, Worldpak respectfully requests

that this Court order Diablo to pay all costs associated with the discovery in this case,

including the forensic retrievable of Diablo's intentionally withheld documents as an

---

[109] *Rimkus,* 688 F.Supp.2d at 618.   *See also, Se. Mech. Servs., Inc. v. Brody,* 657 F. Supp. 2d 1293, 2009 WL 2883057 (M.D. Fla. 2009) (holding that an adverse inference jury instruction was appropriate when a party wiped several Blackberry devices that may have contained emails, telephone records, text messages, and calendar entries relevant to the case); *Goodman v. Praxair Servs., Inc.,* 632 F. Supp. 2d 494, 523-24 (D. Md. 2009) (holding that an adverse jury instruction was proper when a party destroyed a laptop and the party's agent deleted emails after the duty to preserve arose and allowing the opposing side to seek recovery of costs associated with the sanctions motion); *Technical Sales Assocs., Inc. v. Ohio Star Forge Co.,* Nos. 07-11745, 08-13365, 2009 U.S. Dist. LEXIS 22431, 2009 WL 728520, at *9 (E.D. Mich. Mar. 19, 2009) (holding that monetary sanctions were appropriate where a party deleted emails and electronic files after the litigation began and after the party became aware that the adverse party would be seeking a forensic examination but deferring until trial the decision of whether adverse inference jury instructions were appropriate); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.,* No. 3:06-CV-0271-B, 2008 U.S. Dist. LEXIS 60624, 2008 WL 3261095, at *13-14 (N.D. Tex. Aug. 8, 2008) (imposing an adverse inference jury instruction and awarding attorneys' fees and costs against a party for, among other things, intentionally wiping a hard drive so that files would be unrecoverable, damaging backup data, and deleting emails and documents from a web site); *Doe v. Norwalk Cmty. Coll.,* 248 F.R.D. 372, 381-82 (D. Conn. 2007) (imposing an adverse inference jury instruction and awarding attorneys' fees and costs against a party that failed to preserve hard drives and emails).

appropriate sanction, as well as the attorneys' fees and costs associated with Worldpak's discovery efforts.  This is only reasonable method in which to punish such egregious conduct, to deter Diablo and future litigants from engaging in similar conduct and to fully mitigate the prejudice caused to Worldpak and the judicial process.

## **CONCLUSION**

In sum, Diablo has engaged in an orchestrated bad faith campaign to subvert the truth.  It has continually demonstrated utter contempt, not only toward Worldpak, but the entire discovery process.  The manner in which it has conducted discovery in this case is precisely the same manner in which it conducts its business affairs.

Accordingly, Worldpak's Motion for Spoliation should be granted.


Dated: November 8, 2010

                    Respectfully submitted,

                    By:   /s/ Tania Cruz_____
                          Tania Cruz
                          *Pro Hac Vice*
                          Florida Bar No. 0899151
                          tcruz@ssd.com
                          Alvin B. Davis
                          *Pro Hac Vice*
                          Florida Bar No. 218073
                          adavis@ssd.com
                          Squire, Sanders & Dempsey L.L.P.
                          200 South Biscayne Boulevard
                          Miami, Florida  33131-2398
                          Telephone:  305.577.7000
                          Facsimile:  305.577.7001


                          Counsel for Plaintiff
                          WorldPak International, LLC

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 8, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Steven T. Ramos
Ackerman and Savage, LLP
8226 Douglas Avenue, Suite 330
Dallas, Texas 75225
Tel:  (214) 346-4200
Facsimile:  (214) 346-4201

/s/ Tania Cruz

## CERTIFICATE OF CONFERENCE

Undersigned counsel certifies that she has complied with the meet and confer requirement in Local Rule CV-7(h) and (2).  Undersigned conferred with Mr. Ramos and Mr. Ackerman by telephone on November 8, 2010, regarding the relief sought in this motion.  Opposing counsel did not consent.  Accordingly, this motion is opposed.

/s/ Tania Cruz

MIAMI/4259858.3
11/08/10